No. 56,470

DICK HATFIELD CHEVROLET, INC., *Plaintiff-Appellee*, v. BOB WATSON MOTORS, INC., and FIRST NATIONAL BANK OF KINGMAN, KANSAS, *Defendants-Appellants.*

(708 P.2d 494)

Opinion filed October 25, 1985.

*J. Stanley Hill*, of Branine, Chalfant and Hill, of Hutchinson, argued the cause and *Robert E. Nugent, III*, of the same firm, was with him on the briefs for appellants.

*David R. McClure*, of Fettis and McClure, of Wichita, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

LOCKETT, J.: This case is here on petition for review of a Court of Appeals decision. The First National Bank of Kingman, Kansas, (Bank) appealed a district court judgment entered against it and in favor of Dick Hatfield Chevrolet, Inc., (Hatfield) in the amount of $8,005.90 plus interest and costs. The Bank contended it had perfected a security interest in a pickup truck which had been sold by Hatfield to the Bank's customer, Bob Watson Motors, Inc., (Watson). The check given for the purchase price was dishonored by the Bank when it was presented for payment.

The Court of Appeals, in its opinion at 10 Kan. App. 2d 350, 699 P.2d 566 (1985), reversed the district court's finding that the Bank and Watson were jointly and severally liable for the value of the pickup truck. Hatfield's request for review was accepted by this court.

First National Bank of Kingman, Kansas, had an agreement to floor plan part of Watson's inventory. The Bank held a security interest on two pickups which were a part of Watson's inventory. Because Watson was financially insecure, federal authorities had required the Bank to monitor Watson's account as a problem loan on a daily basis for several months prior to these events.

Prior to August 13, 1981, Hatfield had a customer interested in purchasing a pickup similar to one floor planned by Watson. Hatfield contacted Watson and entered into a dealer trade with Watson in which Hatfield would trade to Watson a 1981 Fleetside pickup for $8,005.90, and Watson in return would trade to Hatfield a 1981 Fleetside pickup for $7,849.55 for sale to Hatfield's customer. At the time of the dealer trade, Hatfield and Watson were required to exchange the manufacturer's statement of origin (MSO) and checks for the price of the vehicles.

The Bank, in addition to its loan and security agreement with Watson, had possession of the MSO for the truck Watson wished to trade to Hatfield. The Bank, therefore, had to approve the trade.

Bob Watson, president of Watson, contacted Reynolds German, the Bank officer monitoring the Watson account. Watson informed German of the proposed dealer trade with Hatfield. Watson explained he would receive a check from Hatfield for its pickup and in return Watson would deliver its check to Hatfield for the Hatfield pickup. Watson further explained to German that he needed the Bank to release both the pickup from its security agreement and the MSO on the pickup Watson was trading to Hatfield. German agreed to the trade, deleted the pickup identification number from the security agreement and gave the MSO for the pickup listed under the Bank's security agreement to Bob Watson. German told Bob Watson to bring the Bank the MSO for the truck Watson was purchasing from Hatfield and Hatfield's check.

On August 13, 1981, Watson delivered the MSO for the truck he received from Hatfield and Hatfield's check for the Watson

pickup to the Bank. Later Hatfield's check was deposited in Watson's checking account and the proceeds were eventually applied to Watson's loan from the Bank. The Bank inadvertently inserted the wrong vehicle identification number for the Hatfield pickup into its security agreement with Watson.

On August 18, the Hatfield check arrived through normal banking channels together with 29 other checks of Watson's. Watson did not have sufficient funds to pay all 30 of its checks. The Bank honored 28 checks drawn on Watson's account. Hatfield's check was one of the two checks the Bank decided to return as insufficient.

On August 22, 1981, Watson went out of business and turned its assets over to the Bank. On August 26, 1981, Hatfield received the dishonored check and demanded possession of the truck that he had traded to Watson, or, in the alternative, that the check be made good. Both Watson and the Bank refused to meet either demand. On September 10, 1981, the Bank sold the pickup to another dealer, the proceeds from which were applied to the Watson promissory note originally used to finance the purchase of the two pickups.

On September 9, 1981, Hatfield filed suit against Watson and the Bank requesting either payment or return of the truck and also requesting a restraining order to prevent the defendants from disposing of the vehicle. Despite this, the truck was sold on September 10 by the Bank and the proceeds applied to Watson's loan with the Bank.

At trial, Hatfield was granted summary judgment. Both Watson and the Bank acknowledged that Hatfield was entitled to judgment, but did not agree as against whom judgment should run. The trial court held under two theories that the Bank and Watson were jointly and severally liable to Hatfield for the value of the pickup truck. The Bank appealed, contending that it had a perfected security interest in the truck and as a good faith purchaser had acquired title to the pickup from Watson. Hatfield contended that the Bank did not have a perfected security interest in the truck because of an error it had made in recording the identification number and because the Bank was not a good faith purchaser for value.

Relying on *Trapani v. Universal Credit Co.*, 151 Kan. 715, 100 P.2d 735 (1940), the trial court held that the Bank did not acquire

a valid security interest in the pickup Watson Motors received from Hatfield because of the error it made in recording the identification number. In *Trapani* this court had determined that transposed digits of the motor number in a security agreement did not impart constructive notice of the lien to a prospective purchaser of the conditional sales contract.

The Court of Appeals determined that the incorrect identification number did not prevent the Bank from obtaining a valid security interest in the truck, that a dealer trade took place and that the pickup subject to the trade was covered under the earlier financing statements. Thus, under the UCC, the later security agreement containing the error was encompassed by the original financing statement. For a complete review, see 10 Kan. App. 2d 350.

Citing the 1983 Kansas Comment to K.S.A. 84-9-110, the Court of Appeals agreed that pre-UCC Kansas cash sale case law was changed by 84-9-110. *Iola State Bank v. Bolan*, 235 Kan 175, 679 P.2d 720 (1984). We agree with the Court of Appeals that the trial court's reliance on *Trapani* was inappropriate.

The cases cited by the Court of Appeals, however, are inapplicable. In those cases, a buyer was attempting to invalidate a security agreement in which there was a misdescription of the collateral. In the present case the seller is complaining about the misdescription. The seller, however, could not have been misled by the misdescription because the error in the identification number was not present until after the sale.

Under the Uniform Commercial Code, one of the requirements for a security interest to attach with respect to collateral is that the debtor sign a security agreement that contains a description of the collateral. K.S.A. 84-9-203(1)(a). A financing statement is sufficient if it gives the names of the debtor and the secured party, and contains a statement indicating the types or describing the items of collateral. K.S.A. 84-9-402(1). K.S.A. 84-9-110 provides that a description of personal property is sufficient if it reasonably identifies what is described. The Court of Appeals correctly determined that the description of the personal property was sufficient for the Bank's security interest to attach.

Hatfield argues that Watson had no rights in the vehicle received by Watson that could be subjected to a security interest

because the check drawn by Watson to purchase the vehicle was dishonored. Hatfield relies on K.S.A. 84-2-511(3), which makes payment by check conditional and defeats payment if the check is dishonored. Under Hatfield's theory, Watson's rights in the vehicle were terminated upon dishonor of the check, and therefore the Bank's security interest could not attach. The Bank claims under K.S.A. 84-2-403(1) it obtained title to the pickup when Hatfield traded the vehicle to Watson. The Bank, a secured creditor of Watson's under K.S.A. 84-2-403(4), was a purchaser in good faith for value, thereby acquiring title to the vehicle held by Watson. *Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir.), *cert. denied* 429 U.S. 834 (1976).

A defaulting buyer has the power to transfer greater title than it can claim under the Code, although such a transfer is admittedly wrongful as against the seller. K.S.A. 84-2-403(1)(b) provides in part that when goods have been delivered under a transaction of purchase the purchaser has power to transfer good title even though the delivery was in exchange for a check which is later dishonored. This section indicates that despite the fact Watson tendered a check which was subsequently dishonored, it could transfer good title to a "good faith purchaser for value."

A purchaser is defined in K.S.A. 84-1-201(33) as "a person who takes by purchase." K.S.A. 84-1-201(32) defines purchase as including "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property."

K.S.A. 84-1-201(44)(b) provides that a person gives "value" for rights if he acquires them "as security for or in total or partial satisfaction of a preexisting claim." K.S.A. 84-9-105(1)(m) makes a purchaser a secured party under Article 9. Based on the UCC, the Court of Appeals determined that the Bank gave value for the vehicle, acted in good faith, and therefore acquired a security interest in the pickup.

Is the Bank a good faith purchaser who acquired title under its security agreement with Watson? K.S.A. 84-1-201(19) defines "good faith" as meaning honesty in fact in the conduct or transaction concerned. The trial court's second finding was that the Bank was not a good faith purchaser and therefore acquired no title to the Hatfield pickup under its security agreement. The facts in this case include:

1. Watson was indebted to the Bank under a security agreement with Bank.
2. The Bank's examiners had criticized the Watson loan.
3. The Bank was informed that Watson and Hatfield had entered into a dealer agreement to trade pickups.

These facts alone would not be sufficient to defeat the Bank's rights to the after-acquired property under its security agreement with Watson since: (a) there was a security agreement to which the interest attached; (b) the Bank, the secured party, had given value; and (c) Watson, the debtor, had rights in the collateral. In addition, under the dealer trade agreement between Hatfield, Watson and the Bank:

4. The Bank, as a necessary party to the dealer trade, agreed to release its security interest in the Watson pickup and provide the MSO for that vehicle to Watson to complete the trade between Watson and Hatfield. The Bank acted upon Watson's agreement to return to the Bank the MSO for the Hatfield pickup and Hatfield's check.
5. The Bank received Hatfield's check and applied those funds to the Watson note to replace the pickup it had released from its security agreement with Watson.
6. The Bank, when it received Watson's check to Hatfield for payment of the vehicle Watson had received, instead of honoring the check to complete the dealer trade, determined to pay funds in the Watson account to holders of other checks. Watson's check to Hatfield, drawn on Watson's account, was returned insufficient by the Bank.
7. When Hatfield demanded the Bank either complete the dealer trade as it had previously agreed or return Hatfield's pickup, the Bank refused to do either. Instead, the Bank sold the pickup and applied the proceeds to Watson's loan with the Bank.

The Bank profited twice by its actions: (1) the Bank's interest in the Watson pickup under the security agreement was converted to cash, and (2) the Hatfield vehicle was obtained by the Bank, then sold and the proceeds of the sale applied to reduce Watson's loan to the Bank. By refusing to complete its agreement with Watson and Hatfield, the Bank was enriched by $7,849.55. The Bank's actions cannot be described as honesty in fact in the conduct or the transaction concerned. The Bank was not a good

faith purchaser; therefore, its security interest did not attach to the Hatfield pickup.

We conclude the Court of Appeals erred in reversing the district court. The Court of Appeals is reversed and the district court is affirmed.